SLOAN *v.* DETROIT UNITED RAILWAY.

1. TRIAL—NEGLIGENCE—DIRECTING VERDICT—ANIMALS.
   Upon the trial of a personal injury case against another de-
   fendant and a street railway company in whose car plaintiff
   was riding when a runaway team, alleged to belong to the
   other joint defendant, collided with it, injuring plaintiff, the
   court did not err in directing a verdict for the alleged owner
   of the team, a corporation, which the evidence did not show
   owned or controlled the horses or was in any way connected
   with the accident.[1]

2. SAME—STREET RAILWAYS.
   But as to defendant street railway company, an inference that
   the horses, which were beyond the driver's control, might
   have been seen and avoided by defendant's motorman could
   be fairly drawn, and sufficiently presented a question for the
   jury.

3. SAME—JOINT TORT—NEGLIGENCE.
   Whether or not the driver of the team was negligent, if the
   motorman was negligent, defendant railway corporation was
   liable.

Error to Wayne; Donovan, J. Submitted June 4,
1912. (Docket No. 7.) Decided October 1, 1912.

Case by Mary Sloan against the Detroit United Rail-
way and the Detroit Creamery Company for personal in-
juries. A judgment for defendants- upon a verdict
directed by the court is reviewed by plaintiff on writ of
error. Reversed.

*O'Neil & Command* and *Lehman, Riggs & Lehman,*
for appellant.

*Corliss, Leete & Joslyn* and *Frazer, Griswold &
Slyfield (Thomas T. Leete, Jr.,* of counsel), for appellees.

---

[1] As to presumption of negligence from injury to passenger by
collision, see notes in 13 L. R. A. (N. S.) 608; 29 L. R. A. (N. S.)
812.

Plaintiff's declaration alleged the duty of the defendant railway company to carry her, a passenger on one of its cars, safely and securely, a violation of duty, and careless and negligent conduct in causing the car to come into violent contact and collision with a delivery wagon, owned and operated by the defendant Detroit Creamery Company, at the intersection of Hendricks and Elmwood streets in Detroit. Specifications of the negligent conduct of the railway company are (1) failure to note the approach of the delivery wagon and the direction of its movement in time to bring the car to a stop; (2) running the car at excessive speed, to wit, 20 miles an hour; (3) injuring plaintiff, who was a passenger, and herself free from negligent conduct. The duty of the defendant Detroit Creamery Company is alleged to be to drive its vehicles in a careful manner along the highways of the said city, and when approaching a street car crossing, so as to avoid a collision with street cars; the duty of the drivers of its vehicles to stop, look, and listen before attempting to cross a street railway track, to drive at a rate of speed allowed by law, and to have the vehicle in such control in approaching a street railway crossing that it can be stopped upon the near approach of a car. It is alleged that the agent of the creamery company in charge of one of its wagons drove it against the side of a passing street car, at an intersection of streets, in such manner that the tongue of the wagon pierced the side of the car and injured plaintiff, a passenger in the car; the wagon being driven at the time at high speed, wantonly, and recklessly. Issue having been joined, the cause came on for trial by the court and a jury, and the plaintiff, a witness in her own behalf, described how she came to be injured, as follows:

"I remember the day of December 5, 1909. On that day I left my home to go to a lady that was doing some sewing for me, who lives on Congress street. I do not know whether the number has been changed. Her number used to be 636. I think it is the fourth house from

Chene street.   Her name is Mrs. Hayes.   When I left
my house, I went over to Van Dyke street and called on
one of my sons, and stayed a few minutes, and then
walked over to Kercheval and took the Kercheval car or
the Sherman car.   I got on the car.   I paid my fare to
the conductor.   I am not acquainted with those streets,
and cannot say just how far I rode on that car; but I
think it was to Elmwood and Hendricks streets.   I paid
a five-cent fare and got a transfer to a south Chene car.
The car did not reach south Chene without a mishap.

"*Q.* Just tell the jury now in your own way, and take
all the time you want, what happened?

"*A.* I was watching to see the street where I would get
off, to ring the bell—I was not very well acquainted with
the streets—I saw a big team coming.   It was just com-
ing galloping, and the horses tearing.   I never thought
they would strike me at all; and the first thing I knew I
was knocked right over in the car, and I felt so funny.
*   *   *

" *Q.* Where were you sitting on the car?

"*A.* I was sitting right against the window.

"*Q.* Do you remember at this time the seat that you
were in?

"*A.* Well, I was in the second or third seat; I could
not say.

"*Q.* And were there other people in the other side of
the seat?

"*A.* Yes, sir; there was a lady and an old gentleman
on the same seat.

"*Q.* And they were between you and the other side of
the car?

"*A.* Yes, sir.

"*Q.* So that you had no opportunity to move from the
seat where you were sitting?

"*A.* No, sir.   *   *   *

"*Q.* Did you have an opportunity to move from the
position which you were occupying?   *   *   *

"*A.* No, sir.

"*Q.* Why?

"*A.* Because I did not think I was going to be hurt; I
did not see them coming there until they came right there.
*   *   *   This was on a Sunday that this happened, and
I had an errand to go down to a dressmaker.   I first went
down to my son's on Van Dyke; but I started to go to this
lady's on Congress street.   I think she lived the fourth

house from Chene.  I walked down to my son's.  After
visiting my son, it was about the noon hour, and after
visiting him I started to visit the lady.  To go there, I
took a Sherman car on Kercheval, intending to ride on
that car as far as Chene street, and then transfer and go
down to this lady's house, and before I got to that place
we had this accident.  After I had the accident, they sent
a man for the car.  I went to the lady's house right along.
After the accident on the Sherman car, I went on it to
Chene street and transferred and went down to my
friend's house.   *   *   *

"*Q*. I understood you to say you were sitting in the
second or third seat from the front of the car, a Sherman
car, on the day of the accident?

"*A*. Well, I am tired of talking.  I have told you that
two or three times.

"*Q*. I am sorry; but I want to get at two or three
things about it.  This car was a car that had a middle
door?

"*A*. I do not know how many doors it had; I could not
say.

"*Q*. Well, a Sherman car—that car had seats that ran
crosswise, did it not?

"*A*. Yes, sir.

"*Q*. Mrs. Sloan, the car that you were riding on, the
seats ran crosswise, did they not?

"*A*. Yes, sir.

"*Q*. And do you remember what street it was that you
were near when you saw those horses coming?

"*A*. Well, it was Elmwood and Hendricks, I think.

"*Q*. Which way were the horses coming, from down
towards the river or the other side?

"*A*. They were coming from down next the river.

"*Q*. And there was a team of horses with a pole be-
tween them, and that is part of the rig that ran into the
car, you say, near the seat where you were sitting?

"*A*. Yes, sir; the pole with the iron on it.

"*Q*. Ran through the car?

"*A*. Yes, sir.

"*Q*. And just back of the second or third seat from the
front?

"*A*. Yes, sir.

"*Q*. And then back of the fender the front of the car,
the vestibule, and as far as the third seat?

"*A*. Yes, sir.

"*Q.* And this was at noon, or daylight, as I understand it?

"*A.* Yes, sir.  *  *  *

"*Q.* On this day you say you saw the horses jumping and plunging down the street there, is that right? *  *  *

"*Q.* It is immaterial to me. I am not familiar with that territory. You say the horses came up the street jumping and plunging?

"*A.* Yes, sir.

"*Q.* They seemed to be out of the control of the man?

"*A.* Yes, sir.

"*Q.* What was the man trying to do?

"*A.* He was pulling the reins. I could not see anything else he was doing."

A witness testified to measurements of Hendricks and Elmwood streets at their intersection, and to other distances as follows:

"We made the measurement across Hendricks from curb to curb. The width was 29 feet and 6 inches from curb to curb. On Elmwood it was 26 feet and 3 inches from curb to curb.

"*Q.* From curb to curb?

"*A.* Yes, sir; and from the middle of the car track then they measured 42 feet 10 inches south to Elmwood about, and from that point we figured we could see a car 85 feet 6 inches east on Hendricks.

"*Q.* Did you have any one stand there to see if you could see them in that direction?

"*A.* Mr. Command stood there, and I saw him from these measurements.

"*Q.* You stood on Elmstood and he on Hendricks?

"*A.* Yes, sir."

The bill of exceptions contains no other testimony upon the subject of the cause of the injury, the conduct of any agent or servant of either defendant, or the rate of speed of either vehicle. The attorney for the defendant railway company offered in evidence the ordinance under which defendant was operating. There is no testimony respecting the identity or ownership of the delivery wagon which was in collision with the car. A verdict for defendants was directed by the court. Plaintiff moved for a new

trial, which was refused. In this court plaintiff relies upon the alleged errors committed in directing the verdict and in refusing a new trial upon the ground of newly discovered evidence.

OSTRANDER, J. (*after stating the facts*). It was not error to direct a verdict for the defendant Detroit Creamery Company, because there was no testimony connecting it or its servants, or property, with what occurred.

It was not error to direct a verdict for the defendant railway company, unless, as plaintiff claims, the circumstances may support the inference that the car was carelessly operated. The circumstance supposed to call for the exercise of particular care on the part of the motorman was the approach of the horses and wagon upon the intersecting street. This circumstance is to be regarded with reference to the duty owing to plaintiff, since she is entitled to recover if the motorman was negligent, though the driver of the wagon was also negligent. Manifestly the conduct of the motorman should have been suited to the appearance of things. If the horses were approaching the crossing at a walk, with the approaching car in plain view of the driver, it would be supposed that the horses, and not the car, would stop, if it became necessary for either to stop. The testimony is—and it must be viewed most favorably for plaintiff—that just before striking the car the horses were running and apparently out of control of the driver. The pole of the wagon pierced the side of the moving car near the front of the car. The team was traveling for some distance in view of the motorman. Usually a team of horses attached to a wagon must move some distance before acquiring any considerable momentum and escaping control. And if we assume that the driver of the horses was controlling and urging them to approach the crossing at speed, his purpose and the risk would ordinarily be apparent to a watchful and careful motorman. In my opinion, the testimony is sufficient to support the inference that the motorman did not exercise

the care for the safety of his passengers which the situation apparently demanded, and the case is within the rule of *Thurston* v. *Railway*, 137 Mich. 231 (100 N. W. 395), and *Sewell* v. *Railway*, 158 Mich. 407 (123 N. W. 2). The inference is, of course, open to rebuttal, and may be wholly destroyed when all of the surrounding conditions are considered. We have before us only the testimony for the plaintiff, and, considering that, we are constrained to hold that the court should not have directed a verdict for the defendant railway company.

The judgment is reversed, and a new trial granted.

MOORE, C. J., and STEERE, McALVAY, BROOKE, STONE, and BIRD, JJ., concurred.